Theo Ray THAMES, Appellant,

v.

The STATE of Texas, Appellee.

No. 42540.

Court of Criminal Appeals of Texas.

April 1, 1970.

Rehearing Denied May 27, 1970.

496

Dalton C. Gandy, Fort Worth (Court Appointed), for appellant.

Frank Coffey, Dist. Atty., and Truman Power, John Brady and R. J. Adcock, Asst. Dist. Attys., Fort Worth, and Jim D. Vollers, State's Atty., Austin, for the State.

## OPINION

DOUGLAS, Judge.

The conviction is for murder; the punishment, death.

The record reflects that appellant shot and killed Billy Guy Tolleson, the operator of the Starlight Club in Fort Worth, on December 21, 1967. On the night of December 19, 1967, appellant and Earl Wayne Sanders, a co-indictee, entered the club where appellant wanted to play pool but did not want to wait his turn to play. A dispute arose and appellant produced a knife and his companion Sanders drew a pistol and challenged the customers to a fight and then left. James D. Tidwell, an employee of the club, informed Tolleson, the deceased, of this incident.

Two nights later Earl Wayne Sanders, Charles Hardin, another co-indictee, and the appellant secured pistols and while they were leaving Hardin's house, one of them stated: "I will kill him before he knows what happened." Shortly thereafter, all three appeared in the Starlight Club and two of them deliberately bumped into Bobby Gill, a customer, and turned and smiled at him. Tolleson told Gill that they were probably looking for trouble and to say nothing. Tidwell then informed Tolleson, the deceased, that Earl Wayne Sanders and the appellant were the two men who had previously displayed the knife and pistol and caused the disturbance. Tolleson then went behind the bar, picked up his wife's purse and secured a .22 caliber pistol and placed it in his pocket. He returned to the bar and told Hardin and Sanders that if they were going to come into the club they would have to respect everyone else, and if they had guns, they would have to leave. Hardin stated that he had not been in the previous disturbance and that Tidwell was crazy and a liar. Tolleson then slapped at Hardin who was backing up and pulling a pistol from his sweater. In the meantime, appellant had moved behind the bar. He said to Tolleson: "Hey, buddy, I've got something for you." Then he fired approximately five times, striking Tolleson, who was turning toward appellant pulling his own pistol. Tolleson's wife, who was also behind the bar, was wounded as she ran to get away. Appellant and his companions fled the premises.

The evidence shows that appellant was firing a .32 caliber automatic pistol and that a .38 caliber weapon had been fired in Tolleson's direction from the position occupied by Hardin and that the .22 caliber revolver (the deceased's) had been fired four times.

After leaving the club, Hardin, Sanders and appellant went to Hardin's house where they packed their belongings. Appellant threatened to kill Hardin's wife if she informed the authorities of what she had seen and heard. The three men then left with Hardin's wife and arrived in Waco between 2 and 3 o'clock in the morning. There the three men, who were still armed, secured some $10,000 from an unknown source which was divided among them.

Officers from Tarrant County secured warrants for the arrest of the group but could not find them. Sanders and the appellant fled to Colorado where they evaded arrest by taking the chief of police of Vail, Colorado, and another policeman as prisoners. They then secured transportation at gunpoint and proceeded by back roads

where they thought they had a better chance to escape. They forcefully entered a farm house occupied by a woman and three children and stayed there for a short time, and later they started toward Denver. On the way, appellant took another prisoner and his automobile. Thereafter, appellant and Sanders were arrested February 16, 1968 in St. Bernard Parish in Louisiana and firearms were recovered. After appellant was placed under arrest he made a break by jumping down a flight of stairs, but he was arrested some two hours later.

Appellant presents fifteen grounds of error. In the first ground he contends that the court erred in excluding from the jury panel veniremen who voiced conscientious or religious scruples against the death penalty in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

Before the voir dire examination of the prospective jurors began the trial court informed the attorneys that the holdings in Witherspoon v. State of Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, and Pittman v. State, Tex.Cr.App., 434 S.W.2d 352, were to be utilized in the examination. Some 56 veniremen were examined. Appellant complains that the trial court abused his discretion in sustaining the State's challenge for cause on seven of the prospective jurors.

The range of penalty for murder was explained to the prospective juror Velma Horton, and she was asked:

"Q. My question then to you is, would you be willing to consider all the penalties provided for murder under the Texas law?

"A. Well, no, I cannot.

" * * *

"Q. What part of the penalties that I have gone over with you do you object to?

"A. The death penalty.

"Q. The death penalty?

"A. Yes, sir."

She further testified that she could not consider any set of facts or circumstances so hideous that she could vote for the death penalty. On cross-examination by Mr. Gandy, appellant's counsel, she testified that she had conscientious scruples against the death penalty, that she considered it immoral. She was then asked:

"Q. In other words, could your oath as a juror ever lead you to vote for the death penalty in any case?

"A. I don't think so."

She was then asked:

"Q. Could you abide by the law if the Court tells you that one of the punishments for murder is the death penalty? Could you abide by the Court's instruction?

"A. Yes.

"Q. And follow the law?

"A. Yes, I think I could follow the law."

She further testified that her feelings about the death penalty would not prevent her from determining guilt or innocence. On redirect examination she again testified that she could not conceive of a set of facts or circumstances so terrible and so hideous that she could vote for the death penalty.

The range of punishment was explained to the prospective juror Gerald T. Burch, and he testified that he did not believe in capital punishment, that his attitude toward capital punishment would prevent him from making an impartial decision on the range of punishment, and that he would exclude the death penalty. When asked if he could conceive of a set of facts where he could vote for the death penalty, he answered that he probably could. Then he was asked:

"Q. You could now? Excuse me, but I thought just a moment ago that

you told me that you could not conceive of any set of facts and circumstances where you could vote for the death penalty?

"A. I said I did not believe in the death penalty."

He testified that he did not believe he could write a death penalty verdict. Again he testified that he could not conceive of a set of facts or circumstances that would cause him to vote for the death penalty and if a person was found guilty of murder, he would automatically exclude and vote against capital punishment without regard to the facts and circumstances. On cross-examination he testified that he believed that the death penalty was immoral and that he had conscientious and religious scruples against the death penalty which would compel him to vote against it.

P. C. Jackson testified that he did not believe in the death penalty, that he could never vote to impose the death penalty, and "[A]nd I couldn't, you know, I just couldn't kill a man." On cross-examination he testified that he could not imagine such a horrible crime or a set of facts where he could impose the death penalty.

The prospective juror Scruggs testified that he could not consider the death penalty and that he could not conceive of a fact situation where he could vote for the death penalty, but five years from now his vote might be different. On cross-examination he testified that he could not write his name to a death penalty verdict under any circumstances.

Joseph Hunt testified that he could not consider the death penalty and when asked if he could ever consider it, he stated that it would have to be like the case in Chicago where all those nurses were slain, or something like that. He testified that he could not vote for the death penalty without doing violence to his conscience, and when he was asked if he could conceive of a fact situation where he could vote for the death penalty, he stated: "I would say no again."

He was asked about the Chicago nurse case and was asked if he would change his mind and he said:

"A. More or less, yes. I would say that I—well, I will still stick with no again,"

and then definitely stated that he could not vote for the death penalty.

Barbara Sims testified that she could not impose the death penalty, but that she could determine the guilt of the accused.

Ruth Retzlaff testified that she could not give the death penalty in any murder case and "[I]f it was my family I would be a lot more different, but I wouldn't be—", and that she could not conceive of any situation that would permit her to give the death penalty; that religiously she felt that way. The court asked her if she would automatically vote against the death penalty in this case if she were selected without regard to what evidence might be developed. She answered, "That is right. I could not give the death penalty."

It appears that the seven prospective jurors were disqualified and the trial court did not err in sustaining the challenges for cause under Witherspoon v. Illinois, supra, where it was stated that the rule did not involve the State's assertion of "a right to exclude from the jury in a capital case those who say that they could never vote to impose the death penalty or that they would refuse even to consider its imposition in a case before them." No error is shown, the first ground of error is overruled.

■ In the second ground of error complaint is made that the trial court erred in admitting testimony concerning extraneous offenses at the Starlight Club on December 19, two days prior to the date of the offense, and the ground of error number three is that the trial court erred in failing to charge the jury that such extraneous offenses should be limited to show identification of the appellant only. These two grounds of error have been argued together by the appellant.

This testimony concerned the incident when appellant and Sanders with two girls went to the Starlight Club and appellant did not want to wait his turn to play pool, and an argument followed. Thames said that he would be glad to go outside and fight somebody, and to make sure that it was a fair fight, he pulled out a knife. All the customers backed away, and Sanders said that he would make sure that it was a fair fight and produced a gun. Tidwell thought Thames pulled a gun but he was not positive. Some two days later one of the co-indictees was overheard to say that they would kill him before he knew what happened and shortly thereafter they appeared at the Starlight Club.

In Braxton v. State, 165 Tex.Cr.R. 316, 307 S.W.2d 96, the following applicable language is found:

"A previous difficulty between the defendant and a third person may be proved if it led up to the killing, or involved the deceased in any way, or tends to reveal the defendant's motive or state of mind. * * *"

The trial court had sufficient evidence to conclude that testimony of the transaction on the 19th of December showed motive for the homicide and that appellant and Sanders were seeking revenge because appellant was not permitted to play pool out of turn. The evidence was also admissible to show malice. This taken together with the testimony of Fannie Kidwell (formerly Hardin's wife) that she had heard either appellant or one of the other co-indictees state that they would kill him (Tidwell) before he knew what had happened shows premeditation. In Moss v. State, Tex.Cr. App., 364 S.W.2d 389, this Court stated:

"Furthermore, the testimony relative to appellant shooting the injured party in 1961 was admissible as original evidence to show malice, intent, and motive on the part of appellant. Such testimony being admissible to prove a main issue in the case, a charge limiting the jury's consideration thereof was not required."

In the present case the evidence was admissible to prove the main issues in the case such as malice and intent as well as motive, and the court did not err in refusing to limit the charge as requested by appellant to the identity of appellant.

The second and third grounds of error are overruled.

In the fourth and fifth grounds of error, appellant complains that the trial court erred in admitting evidence of extraneous offenses committed by appellant in the States of Colorado and Louisiana.

Evidence of extraneous offenses shows that appellant and Sanders resisted arrest in Colorado, kidnapped two officers, took automobiles at gunpoint and took devious routes to get to the City of Denver to avoid detection.

The evidence further shows that appellant and Sanders were arrested in St. Bernard, Louisiana. When appellant objected that the arrest in Louisiana was illegal, the facts were developed that officers were checking the motel for prostitution, because a lot of prostitution had been going on there. A Louisiana officer testified that the officers saw an out-of-state license plate and checked with the manager and went to the room; that only one person was registered in the room and three were occupying it in violation of Louisiana law; that the officer knocked at the door and one of the occupants came to the door and invited him in and while inside he saw a bone-handled pistol like the one that had been reported used in a robbery and that one of the occupants in the room partially fitted the description of the person in the robbery; that upon seeing the pistol he placed the three under arrest. Other guns were discovered. While in the process of searching and handcuffing the occupants, the manager of the motel walked between the appellant and an officer. Appellant jumped down a flight of six stairs to a landing and jumped down another flight and ran and was arrested some two hours later. There was sufficient evidence

for the trial court to conclude that the arrest in Louisiana was legal.

In Cawley v. State, 166 Tex.Cr.R. 37, 310 S.W.2d 340, this Court held that escape, flight and attempts to escape are always admissible as evidence of guilt.

Churchill v. State, 167 Tex.Cr.R. 26, 317 S.W.2d 541, held where a defendant had fled after the shooting, a .45 caliber pistol taken from him at the time of his arrest was admissible notwithstanding the offense had been committed with a different weapon.

The fact that the circumstances of flight shows the commission of another crime does not render the evidence inadmissible. Cox v. State, 170 Tex.Cr.R. 128, 338 S.W.2d 711. See Enriquez v. State, Tex.Cr.App., 429 S.W.2d 141; Ellisor v. State, 162 Tex.Cr.R. 117, 282 S.W.2d 393, and Isaac v. State, Tex.Cr.App., 421 S.W. 2d 661. In proving flight, it is also relevant to show efforts made to locate or apprehend the accused, his pursuit and capture, including his resistance to arrest when overtaken. Martinez v. State, 140 Tex. Cr.R. 159, 140 S.W.2d 187; 153 S.W.2d 721.

The fourth and fifth grounds of error are overruled.

Complaint is made in the sixth ground of error that the court permitted May Belle Tolleson, the widow of the deceased, to testify pertaining to her identification of appellant at a lineup in Louisiana. This testimony about the lineup was first brought out by appellant during cross-examination of the witness. The State then proved that she identified appellant at the lineup.

Article 38.24, Vernon's Ann.C.C.P., provides that where part of an act or declaration is given in evidence by one party, the whole on the same subject may be inquired into by the other.

No error is shown; the sixth ground of error is overruled.

In the seventh ground of error, it is contended that the trial court erred in permitting May Belle Tolleson to make in-court identification of appellant because such identification was tainted by an illegal lineup held in Louisiana.

Outside the presence of the jury, she testified that appellant was in the club that night; that her identification was based on what happened at the club; that on the night of the shooting she went to the sheriff's office and was shown some 12 to 15 pictures, all at the same time; that later she went to Louisiana and picked the appellant out of a lineup. She was asked if having seen appellant in the lineup firmed or strengthened her opinion that he was the man who had shot her husband, and she answered, "I remember him distinctly the night of the shooting." She was then asked if the fact that she had seen him in the lineup confirmed and made certain in her own mind that he was the person; she answered, "Yes." She was asked if she were more certain after she had viewed the lineup, and she answered, "I was certain that night." She testified that at the time that she had seen the pictures in the sheriff's office, she was certain that appellant was the man who had shot her husband, and that "[L]ousiana had nothing to do with my certainty."

The trial court found that her identification was based on what happened at the time of the shooting and was not affected by the lineup in Louisiana.

Appellant argues that the fact that the witness had seen a photograph of the appellant in a group of 12 or 15, plus the lineup, tainted her testimony.

In Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247, complaint was made of a pretrial identification where photographs were shown to witnesses. There the court stated:

"* * * [c]onvictions based on eyewitness identification at trial following pretrial identification by photograph will

be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to very substantial likelihood of irreparable misidentification."

In the present case there is no showing that the exhibition of the photographs, including one of the appellant, was unnecessarily suggestive and conducive to misidentification as to deny appellant due process of law. As in the Simmons case, it was essential for the enforcement officials to act swiftly to determine if they were on the right track and the justification of this method of procedure was hardly less compelling than the one the Supreme Court held was justified in Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199. See Bowman v. State, Tex.Cr.App., 446 S.W.2d 320.

The trial court heard the witnesses and had sufficient facts to conclude that there was clear and convincing proof that the in-court identification was of independent origin as he so found. No abuse of discretion has been shown. See Martinez v. State, Tex.Cr.App., 437 S.W.2d 842.

The seventh ground of error is overruled.

 It is contended in the eighth ground of error that the trial court abused its discretion in denying a motion for new trial because of the overruling of the motion for continuance due to the absence of Sam Richardson, an uncle of the co-indictee Hardin, who it is contended would have established an alibi had the trial court waited until he returned from Vietnam after his service with the army.[1]

The amended motion for new trial does not contain an affidavit of the absent witness, named in the motion for continuance, that he would testify as alleged in the mo-

tion. A requisite is that an affidavit of the witness is necessary to establish abuse of judicial discretion. Sustaita v. State, Tex.Cr.App., 396 S.W.2d 381; Young v. State, Tex.Cr.App., 384 S.W.2d 710; Bradshaw v. State, 167 Tex.Cr.R. 469, 320 S.W.2d 833.

If absent testimony be considered as cumulative, when the defense is alibi, the rule upholding the refusal of a continuance when testimony is cumulative is not strictly applied. Harvey v. State, 133 Tex. Cr.R. 90, 109 S.W.2d 474.

However, it should be noted that appellant attempted to prove an alibi by John Paul Richardson but was unsuccessful and abandoned this defense. The record further shows that there was another witness, Jackie Richardson, present at the house where a party was taking place with Sam Richardson at the time of the murder. Jackie Richardson, who apparently could have proved the fact of alibi, if true, was present and in attendance of the court during the trial and was brought forward and tendered by the State to the defense. The defense chose not to use him. "When it appears that the same facts, if true, could have been proven by witnesses present," no error is shown. Wade v. State, 65 Tex. Cr.R. 125, 144 S.W. 246.

In Crawford v. State, 66 Tex.Cr.R. 433, 147 S.W. 229, it was shown that another witness was in attendance on the court and was not placed on the stand. The court held that the appellant could not claim a continuance on account of the absence of other witnesses upon the same point.

No abuse of discretion has been shown; the eighth ground of error is overruled.

 In the ninth ground of error it is contended that the trial court erred in over-

---

1. This case had been set for trial for April 29, 1968, again for May 28, 1968, and a third setting was for the week of September 3, 1968. The motion for continuance was filed on the 9th of September, the day the case actually went to trial.

The original motion for new trial was filed on September 24, 1968, and an extension of time was granted to file an amended motion for new trial to the 30th day of October, which was heard on the 13th day of November, 1968.

ruling a motion for new trial because of the overruling of the motion for continuance because of the absence of a witness Jack Robert Unger. The application for a subpoena for Unger was filed on the 6th day of September, some three days before the case was tried. The amended motion for new trial does not contain an affidavit of the absent witness showing that he would have testified as alleged in the motion for continuance. Such an affidavit is necessary to establish an abuse of discretion. Sustaita v. State, Young v. State, and Bradshaw v. State, supra.

No abuse of discretion has been shown; the ninth ground of error is overruled.

■ Ground of error number ten is as follows:

"The Court erred in permitting the investigating officer to testify, over timely objection, as to his issuing a warrant for the arrest of the defendant following investigation as such testimony constitutes an opinion of the officer as to the guilt of the defendant."

W. D. Meador testified that at the time of the offense he was a deputy sheriff of Tarrant County. He was asked if he obtained a description of the man that was behind the bar firing a gun at Tolleson, and he answered that he did. Three other similar questions were asked and objections were sustained, and the court instructed the jury not to consider any of the questions asked or the answers given on this matter. Later Meador was asked if he filed on anybody as the accused at this particular shooting. An objection to the question was overruled, and he testified that warrants were issued against three persons, including appellant. It was shown without objection that the officers looked for appellant from the time of this offense until February when the arrest was made. While some of the questions were no doubt based upon hearsay and should not have been asked, all that eventually was admitted before the jury was that warrants had been issued for appellant and two others.

The evidence that the warrant had been issued, and that he had been looking for appellant was admissible to show flight. No reversible error is shown.

The tenth ground of error is overruled.

■ In the eleventh ground of error, appellant seeks to complain of the court's charge in three particulars. Assuming that these complaints should be considered by the court, they will be discussed.

He contends that the court should not have charged on the law of principals.

The evidence, as heretofore set out, shows that the three went to the club and were acting together. In Flores v. State, Tex.Cr.App., 372 S.W.2d 687, this Court stated:

"The proof of appellant's presence at the scene and his active participation with the other parties in the attack upon the deceased authorized the submission of such theory of principals to the jury."

■ Appellant also complains that the trial court erred in refusing to charge on self-defense or defense of another. The evidence as heretofore outlined does not raise such an issue.

■ Appellant contends that the trial court erred in failing to charge under Article 1223, Vernon's Ann.P.C., that the deceased presumed to kill the appellant because he possessed a .22 caliber pistol.

The record reflects that Thames had fired at least three times before Tolleson, the deceased, had reached for his gun. There was no evidence to the contrary. In Henderson v. State, 169 Tex.Cr.R. 206, 332 S.W.2d 705, this Court held that the mere possession of a weapon is not sufficient to invoke the presumption under Article 1223, supra. See Dunham v. State, 159 Tex.Cr.R. 555, 265 S.W.2d 819. The issue of self-defense was not raised by the evidence.

No reversible error in the charge is shown.

It is contended in the twelfth ground of error that reversible error was committed by the prosecuting attorney when he argued at the guilt stage of the trial "[T]his is a form of murder that the State has contended all throughout the trial. The other form of murder is over in paragraph five. This is murder without malice, the punishment being only two to five years, a maximum of—."

Appellant's counsel objected that the matter of punishment was not included in the court's charge and that punishment could only be considered after there had been a guilty verdict and asked the court to instruct the jury not to consider it. The court instructed the jury not to consider the statement and overruled the motion for mistrial.

Article 37.07, Sec. 2(a), V.A.C.C.P., provided that the court's charge submitting the issue of guilt or innocence should include the punishment authorized for the offense or offenses submitted. This provision was omitted when the Article was amended in 1967.

In Watts v. State, Tex.Cr.App., 430 S.W.2d 200, the conviction was for burglary; a prior conviction was successfully used for enhancement, and the punishment was assessed at twelve years. The case was tried after the effective date of the amendment to Article 37.07 which omitted the provision that the possible punishments should be included in the court's charge at the guilt stage of the trial. The defendant objected, because the court advised the jury of the punishment for burglary, on the ground that such instruction was immaterial and permitted the jury to consider a minimum term in the penitentiary "as having a bearing on the issue of guilt." This Court held that the giving of such instruction was not calculated to injure the rights of the defendant and did not call for a reversal.

Likewise, the statement in the present case was not calculated to injure the rights of appellant, and the court instructed the jury not to consider it. See Webb v. State, Tex.Cr.App., 439 S.W.2d 342. No reversible error is shown; the twelfth ground of error is overruled.

Complaint is made in the thirteenth ground of error that reversible error was committed when the prosecutor argued at the penalty stage of the trial "[I]f I was not absolutely, concretely, one hundred percent sure of his guilt and what I'm telling you, I would not make this my fourth time to ask for death penalty."

There was no objection to this argument and no request for an instruction by the court to the jury to disregard the same.

The thirteenth ground of error is overruled.

In the fourteenth ground of error, it is contended that the evidence is insufficient to show malice.

The evidence, as heretofore set out, is sufficient to show malice.

Complaint is made in the fifteenth ground of error that the trial court erred in overruling an amended motion for new trial because of jury misconduct. First it is contended that a juror stated, "That nine out of ten cases where a jury assessed the death penalty the defendant did not actually get death," and that such statement affected the verdict of the jury.

The juror to whom this statement was attributed testified at the hearing on the motion for new trial that such statement was made after the jury had been dismissed by the court and they were getting their suitcases. This could not have influenced the verdict.

It is further contended that the jurors received additional testimony because the juror Charles Ellis drew pictures of bullets of different calibers. There was a discussion that pistols of different caliber were fired. The different sizes of the bullets were illustrated by Ellis. There is no showing that he gave any other juror

misinformation about the size of bullets. No reversible error is shown; the fifteenth ground of error is overruled.

The judgment is affirmed.