234 So.2d 579

Johnny Mack **JACKSON**

**v.**

**STATE.**

**4 Div. 319.**

Supreme Court of Alabama.

April 9, 1970.

Smith & Smith, Dothan, Jackson W. Stokes, Elba, for appellant.

MacDonald Gallion, Atty. Gen., David W. Clark, Asst. Atty. Gen., for the State.

HARWOOD, Justice.

This appellant was found guilty of rape by a jury which fixed his punishment at death. Judgment was entered pursuant to the verdict. A motion for a new trial was duly filed and after a hearing was denied. This appeal followed.

The evidence presented by the state in the trial below tends to show that the victim had returned to her home in Dothan around 4:30 P.M., on 7 January 1967, after a shopping trip. She placed some groceries in the kitchen and then went into the bedroom where she removed her shoes, hose, and girdle, and lay down on a bed. She had turned on the lights in the kitchen, den, and bedroom. She soon fell asleep. She awoke later and saw the appellant in the bedroom. He came to the bed and ordered her to remove her clothes. She refused. The appellant threatened to kill her and stabbed her in the left thigh

with a sharp instrument. He then tore off her clothes and raped her.

He dragged her into the dining room and struggled with her. During this struggle, the appellant stabbed the victim in the neck. She bled profusely from this wound and the appellant turned her loose. At this time the victim went out of the back door of her house and to her sister's house next door. Her sister admitted her, and hearing the victim's complaints and observing her bloody condition, called an ambulance and the police.

The ambulance, with a doctor, arrived and the victim was taken to a hospital. The victim had become cyanose and had difficulty in breathing. She was taken to the emergency room and a trachaeotomy was performed. She was then taken to an operating room where an operation was performed on her neck wound. While she was anesthetized, a pelvic examination was made. Seminal fluid was found in her vagina, which upon laboratory examination disclosed immobile spermatozoa.

Upon investigation at the victim's home shortly after their arrival, the police found a pair of black handled scissors under a table in the dining room. These, along with a shirt, trousers, and shorts which the appellant wore at the time of his arrest, were forwarded to the state toxicologist at Auburn University. Examination of these articles revealed that human blood was on all of them. Semen stains were found on the shorts. In addition to blood, grease was visible on the scissors. The victim testified the scissors did not belong to her.

Fred Green testified that on the Saturday this offense was allegedly committed, he had employed the appellant and another man that morning to clean up some restaurant equipment prior to storing it in a warehouse. A pair of scissors, similar in size, make, and color, to the scissors found in the victim's home, along with knives, meat cleavers, etc., was in the restaurant equipment. Green locked the warehouse later in the day. On Tuesday after the alleged offense, he accompanied a police officer to the warehouse, unlocked it, and made a search for the scissors, which could not be found.

In his own behalf, the appellant testified he had not been at the victim's home at any time, and was not guilty of raping her. His testimony further tended to establish an alibi, and a number of witnesses were presented to corroborate the appellant's alibi testimony.

This offense was committed in Houston County. In the Circuit Court of that county the appellant filed a motion for a change of venue. This motion was granted, and the trial was removed to Coffee County.

Prior to removal of the trial to Coffee County, the appellant filed a motion to quash the indictment on the grounds that negroes were systematically excluded from the jury roll of Houston County because of their race. The motion was also filed requesting that the jury roll of Houston County be produced in court in order to enable the attorneys representing the appellant to copy or photostat the same.

At the hearing on these motions, attorneys for the appellant, and the appellant himself when questioned by the court, made known to the court that they did not desire to present any evidence in support of the motions to quash the indictment. The state did, however, present evidence showing that negroes were not systematically excluded from the jury rolls of Houston County because of race.

The court denied the motion to quash, and also the motion for the roll to be produced for copying or photostating.

Thereafter the appellant filed a motion for a change of venue, and after hearing, the court entered an order removing the case to Coffee County, Elba Division, for trial.

In Coffee County the appellant filed motions to strike or suppress the jury venire

drawn to try him, a motion to examine the jury roll and photostat the same, and a motion for the production of certain evidence.

The court after a hearing, granted the motion to strike the jury venire apparently because the court considered that too few negro women were on the jury roll. The court ordered the jury commission of Coffee County to empty the jury box and make up a new jury roll for the Elba Division of Coffee County.

This was done, and another venire was drawn for the trial of the appellant.

Another motion to suppress the last drawn venire was filed. On the hearing on this motion, the evidence introduced by the appellant consisted only of the population figures of Coffee County as a whole as shown by the last federal census. These figures showed the white population, male and female, and the negro population, male and female.

The state introduced as witnesses the members of the Coffee County jury commission. The testimony of these witnesses was directed toward showing that following the court's order to refill the jury box for Coffee County, Elba Division, they had placed therein the names of citizens qualified for jury service, male and female, white and colored. They stated that in seeking the names of qualified citizens they had contacted reputable citizens in all parts of the Elba Division of Coffee County, white and negro, and had written letters to white and negro citizens seeking names and recommendations for prospective jurors. No person had been excluded from the jury box because of race, creed, or color.

The evidence also showed that the larger percentage of the negro population of Coffee County resided in Enterprise Division of the County, and that in the Elba Division several of the beats had no negroes residing therein, and other beats therein had only one or two negro families, all of whom were past the age for jury service.

Neither the jury cards nor the jury roll contained any information indicating the race of the juror.

The federal census was for Coffee County as a whole, and does not reveal separately the population of the Elba and Enterprise Divisions of the Circuit Court.

The court found that the new jury roll contained 1314 names, and as nearly as could be determined from the evidence presented there were 802 white males, 408 white females, 68 negro males, and 36 negro females on the jury roll.

Under the evidence presented we think it clear that the appellant failed to establish that negroes were systematically excluded from the jury rolls of Coffee County, Elba Division. There was no error in the action of the court denying appellant's motion to suppress the last venire drawn for appellant's trial.

The court denied appellant's re-filed motion for production of the jury roll of Coffee County, Elba Division, for the purpose of enabling appellant's attorneys to photostat the same.

We think the motions to produce the jury rolls made in connection with the motion to quash the indictment in Houston County, and the same motion made in Coffee County in connection with the motion to suppress the venire summoned to try the appellant, may well be treated together.

In the hearings on the respective motions, the appellant failed to introduce any evidence tending to show that negroes had been systematically excluded from the jury rolls either in Houston or Coffee Counties. The evidence offered by the state tended to show that negroes had not been so excluded.

In fact in the hearing in Coffee County, the entire jury commission was present in court, and the District Attorney announced their presence, and that the jury roll and jury box would be made available to appellant's attorneys in open court.

The court stated that the attorneys for the appellant would be given full opportunity to examine the jury roll, and examine the jury commissioners, and the attorneys would be given the opportunity to examine the jury roll "as long as you want to examine it in open court with us here." The court then declared a recess and turned the jury roll over to the appellant's attorneys.

It was stipulated that there was no way to tell from the jury roll or jury cards whether a citizen was white or colored, other than from the personal knowledge of the jury commissioners.

The jury commissioners were examined along this line, the results of their testimony being heretofore set out above.

Section 20, Title 30, Code of Alabama 1940, provides, among other things that:

"* * * The jury roll shall be kept securely and for the use of the jury commission exclusively. It shall not be inspected by anyone except the members of the commission or by the clerk of the commission upon the authority of the commission, unless under an order of the judge of the circuit court or other court of record having jurisdiction."

■ The jury roll is in no sense a public record intended to be exposed either to the general public or to those interested in the personnel of future juries by reason of their interest in pending or anticipated litigation. Otherwise, "serious evils in the administration of justice by jury trial, is hardly open to doubt." State ex rel. Denson v. Miller, 204 Ala. 234, 85 So. 700. To the same effect see Wilson v. Brown, 241 Ala. 178, 1 So.2d 914.

■ It appears that the court in the Coffee County proceedings, did permit the attorneys for the appellant a full inspection of the jury roll. It did not permit a copy or photostat of the jury roll to be made. In view of the legislative policy evidenced by Section 20 of Title 30, Code of Alabama 1940, and the decisions thereunder, the court below in the exercise of its discretion, granted to the appellant every right and privilege to which he was entitled, compatible with the public interest, in permitting an inspection of the jury roll "under the eye of the court." See State ex rel. Denson v. Miller, supra.

The court granted appellant's motion for production of the names of prospective witnesses, and physical objects proposed to be used by the state in the trial of the appellant.

It also appears from the record that the appellant petitioned the court to appoint physicians to determine appellant's sanity prior to trial pursuant to Section 426, Title 15, Code of Alabama 1940. This petition was granted and a hearing thereon was set. At this hearing one of the appointed physicians testified he had known the appellant for a number of years, and had examined the appellant in jail pursuant to the court's order. The second physician testified he had examined the appellant for some thirty minutes in jail.

■ Both physicians testified that in their opinion the appellant was sane, and suffering with no mental disease or trouble insofar as they could ascertain. The appellant offered no evidence at this hearing. Clearly, the court was correct in denying that part of the petition requesting that the appellant be taken to the Alabama Hospital for the Insane for further examination as to his mental state.

On Sunday afternoon following the occurrence on Saturday, Lieutenant Deal of the Dothan Police Department, took three photographs of three colored males to the hospital, one photograph being of the appellant. He stood in the room and these photographs were shown to the victim. She was unable to talk at this time because of her neck wound. She indicated that two of the photographs were not those of her assailant. When shown the photograph of the appellant, she became excited and indicated that this was a photograph of her assailant.

The appellant testified that he was arrested Sunday night about 10:30 P.M., and taken to the Dothan city jail.

On Monday morning, Deal returned to the hospital with another trio of photographs, one of which was of the appellant, but different from the one shown on Sunday afternoon. The victim was able to speak at this time. Again, she picked out the photograph of the appellant as being that of her assailant. Returning to the police station, Lieutenant Deal swore out a warrant against the appellant. It was also on Monday that Lieutenant Deal obtained appellant's clothes which he forwarded to the toxicologist.

On 8 March 1967, the victim viewed a lineup of six males of approximately the same size, build, and color. The victim identified the appellant in this lineup as being her assailant.

At the trial the victim, while on the witness stand, was asked if the appellant was the person who had attacked her. Counsel for appellant objected to this question on the grounds that there had been previous photographs and lineup identifications at a time when defense counsel were not present.

The jury was excused and the victim was then examined. She testified that at no time was any suggestion made to her by the police, or anyone else, relating to the identity of the appellant. At the time of the lineup identification, she was not even informed that her assailant might be in the group she viewed.

Upon questioning by the court, the victim testified that the appellant was her assailant; that the lights were on in the bedroom, dining room, and den during the entire occurrence which lasted some 30 minutes, and that her courtroom identification was entirely independent of the photographs and lineup identifications, and in no wise influenced by them.

The jury being recalled, the victim was permitted, over objection, to testify that the appellant was the man who had attacked her.

We think that the victim's testimony that her courtoom identification of the appellant was entirely independent of and uninfluenced by the prior photographic and lineup identifications, and the ample opportunity the victim had of observing the appellant in well lighted rooms, and having his identity impressed upon her mind, would meet the requirements of United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149.

But we need not answer this question on this point positively since the photographs were shown the victim on 8 and 9 January 1967, and she attended the lineup on 8 or 9 March 1967. In Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199, it was held that the doctrine enunciated in *Wade*, supra, requiring the exclusion of evidence tainted by exhibiting the accused to identifying witnesses in the absence of counsel, affects only confrontations conducted after 12 June 1967.

This entire record reflects the meticulous and conscientious efforts of the able and experienced trial judge to fully protect every constitutional and legal right of this accused during all of the proceedings below.

A serious question is presented by the court's action in sustaining the state's challenges to four jurors solely on the grounds that they stated they had a fixed opinion against the imposition of the death penalty.

At the time this trial was entered upon, and the judgment entered, March 1968, it was well established by statute (see Section 57, Title 30, Code of Alabama 1940), and by our decisions, that a fixed opinion against the imposition of the death sentence, or against imposing a penitentiary sentence, was a valid ground to challenge a venireman for cause. The court's rulings in this regard were in conformity with these theretofore established principles.

The judgment in this case was entered on 6 March 1968.

On 3 June 1968, the United States Supreme Court rendered its decision in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776. Involved in that decision was the action of the trial court in excusing for cause certain jurors who had expressed opposition to the imposition of the death penalty, in reply to general questions addressed to them. At this time an Illinois statute provided that it should be a cause for challenge of any juror who, on being examined, should state that he had "conscientious scruples against capital punishment, or that he is opposed to the same." The general questions put to the jurors were in line with the statute.

The United States Supreme Court reviewed the judgment on the basis, as stated in footnote 9, that a general question as to the presence of reservations or scruples is far from an inquiry which separates those who would never vote for the ultimate penalty from those who would reserve it for the direst cases. Unless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it cannot be assumed that such is his position.

In footnote 22, the court made it clear that this doctrine was to apply retroactively.

In the present case the motion for a new trial, filed on 4 April 1968, came on for hearing on 2 July 1968, and on 5 July 1968, the trial court denied the motion for a new trial.

The doctrine of *Witherspoon*, supra, in reference to excusing jurors because of asserted opposition to capital punishment was presented to the court on grounds asserted in the motion for a new trial.

The record shows that four jurors were removed from the venire on challenge by the state in view of their answers during the qualification of the jurors.

In each instance, the record shows in substance the following:

"The Court: Have you a fixed opinion against capital or penitentiary punishment?"

Upon the juror answering in the affirmative, the court then asked each juror in substance:

"You do tell the court you have a fixed opinion against capital or penitentiary sentence?"

Section 57, Title 30, Code of Alabama 1940, provides that on the trial for any offense which may be punished capitally, "it is a good cause of challenge by the state that the person has a fixed opinion against capital or penitentiary punishments."

The court in denying the motion for a new trial, noted that the majority opinion in *Witherspoon*, supra, had described the issue relative to challenging the jurors as being a narrow one. Since the wording in the Illinois statute made "conscientious scruples" against capital punishment, or that a juror was "opposed" to it, grounds for challenge for cause, whereas the Alabama statute designated "fixed opinion" as the criterion, the court concluded:

"The Alabama term 'fixed opinion against' obviously means just what the term implies, that under no circumstances would a juror impose capital punishment."

The court concluded that the difference between the standards specified in the Illinois statute and those of the Alabama statute removed the Alabama statute from the influence of *Witherspoon*, supra.

During the pendency of this appeal in this court, the United States Supreme Court rendered its opinion in Boulden v. Holman, Warden, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433.

Boulden's conviction for murder and death sentence had been affirmed by this court. (See Boulden v. State, 278 Ala. 437, 179 So.2d 20.) Thereafter, his peti-

tion for relief in habeas corpus proceedings alleging his conviction was based in part on an involuntary confession, was denied by Judge Frank M. Johnson of the United States Court for the Middle District of Alabama. The Court of Appeals for the Fifth Circuit affirmed. The United States Supreme Court granted certiorari.

It appeared from the record, though the issue was not raised in the U. S. District Court, nor in the Fifth Circuit Court of Appeals, nor in the certiorari, that a number of jurors had been excused on challenge because of their fixed opinions against capital punishment. The United States Supreme Court's opinion sets forth:

"* * * Eleven veniremen, however, appear to have been excused for cause simply on the basis of their affirmative answers to the question whether, in the statutory language, they had 'a fixed opinion against' capital punishment.

\*     \*     \*     \*     \*     \*

"Two other veniremen seem to have been excluded merely by virtue of their statements that they did not 'believe in' capital punishment. Yet it is entirely possible that a person who has 'a fixed opinion against' or who does not 'believe in' capital punishment might nevertheless be perfectly able as a juror to abide by existing law—to follow conscientiously the instructions of a trial judge and to consider fairly the imposition of the death sentence in a particular case.

"It appears, therefore, that the sentence of death imposed upon the petitioner cannot constitutionally stand under Witherspoon v. Illinois. We do not, however, finally decide that question here, for several reasons. * * *"

The Supreme Court of the United States then vacated the judgment of the Fifth Circuit Court of Appeals and remanded the case to the United States District Court "where the issue that has belatedly been brought to our attention may be properly and fully considered."

We feel that in the present case a further hearing should be had in the court below in reference to the determination of the concept of "fixed opinion" against capital punishment held by those jurors who were excused upon challenge by the state upon their affirmative answers to the general question propounded to them.

■ Since *Witherspoon* and *Boulden,* supra, it is clear that an affirmative answer to the general question that a juror is opposed to capital punishment, or has conscientious scruples against imposing such penalty, or has a fixed opinion against capital punishment is not a sufficient ground for challenge for cause. A juror giving such answer must be examined further to determine if his opposition is such that he would not inflict a death sentence regardless of the evidence and instructions of the court as to the governing law.

Accordingly, this case is remanded to the lower court with instructions that a hearing be conducted with the appellant and his attorneys present, and those jurors who were excused upon challenge because of their affirmative answers to the general question as to a fixed opinion against capital punishment, be summonsed and examined.

This examination should be directed toward determining whether or not they could, in view of their affirmative answers as to having fixed opinions against capital punishment, nevertheless consider the evidence and instructions of the court and return a verdict of guilty although that verdict could result in a death penalty, if they, being the triers of fact were convinced of the guilt of the accused, and that the facts warranted a sentence of death.

The court is further instructed that this hearing be conducted as speedily as is feasible, that a full record be made thereof, a transcript of such record be made, together with the court's conclusions from the evidence adduced, and that a transcript of these proceedings under the seal of the clerk, be promptly forwarded to this court.

**572**

Remanded for further proceedings in accordance with this opinion.

All the Justices concur, except MADDOX, J., not sitting.