**Leopoldo MORALES, Jr., Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 42743.**

Court of Criminal Appeals of Texas.

April 29, 1970.

Rehearing Denied Oct. 7, 1970.
Second Rehearing Denied Nov. 16, 1970.

Richard T. Marshall, J. G. Lay, El Paso, Lucy R. Edwards, El Paso (on the brief), for appellant.

Jamie C. Boyd, Dist. Atty., and Thomas F. Keever, Asst. Dist. Atty., El Paso, and Jim D. Vollers, State's Atty., Austin, for the State.

## OPINION

MORRISON, Judge.

The offense is murder; the punishment, death.

The fact that appellant killed four people and tried to kill a fifth is not questioned. In appellant's brief the following questions are propounded:

1. Did the Court err in refusing a new trial upon a Motion based on new evidence of insanity as a general defense?

2. Did the Court err in refusing a new trial where Appellant presented sufficient newly discovered evidence at the time of his Motion to establish that such evidence would be more than sufficient to create in the minds of the jury a reasonable doubt as to the propriety of the imposition of the death penalty?

3. Did the Court err in refusing a new trial where the evidence at the New Trial Motion hearing was uncontroverted and established that the Appellant genuinely could not remember at the time of his trial any of the incidents of the crime or crimes for which he was charged, and in particular of the crime for which he is condemned to death, where such conclusive evidence was not available at the time of his trial for presentation and consideration by the jury in determining not only the guilt of the Appellant but especially in assessing his punishment?

4. Is the imposition of the death penalty in this case violative of the Eighth and Fourteenth Amendments of the United States Constitution in that the same constitutes cruel and unusual punishment in a situation where the evidence is uncontroverted that the Appellant has no memory of the commission of the offense for which the death penalty was imposed?

The answers, as a study of the record reveals, are as follows:

I. Prior to trial with the authorization and approval of trial defense counsel, appellant was given a psychiatric examination by Dr. Hornisher who reported, "no disease found, psychiatric or neurological, functional or organic" at the conclusion of his three page report which was given to appellant's retained attorney. In such report there appears a rather full account given by appellant of an injury which he received by being shot in the hip, but there is no mention of any injury to his head. At the trial, the defense of insanity was not raised, and the defense interposed was that of alibi. At the hearing, Dr. Ziporyn testified, "However, when Mr. Morales is not under the influence of drugs, he does have enough stability to handle this problem in ways which are socially acceptable."

Appellant's first and amended motions for new trial neither mentioned the question of appellant's sanity. They were

overruled and notice of appeal was given. Belatedly and without withdrawing his notice of appeal, a new attorney came into the case and filed still another motion for new trial. This clearly came too late, but the evidence adduced at the hearing which the careful trial judge held will be discussed.

■ II. The allegedly newly discovered evidence was that "such new testimony was not known to the defendant or his attorneys beforehand and was such as reasonable diligence could not have secured at the trial, for the reason that the same consists of expert testimony exclusively available to only a handful of highly sophisticated psychiatrists throughout the United States, psychiatrists specializing in advanced study of criminal insanity * * *."

Dr. Ziporyn (who testified by interrogatories at the hearing) stated that he had examined appellant for one hour at the El Paso jail after his conviction, in the case at bar, and his "* * * diagnosis was that Mr. Morales has a chronic brain syndrome, associated with cerebral trauma, and that at the time referred to in the previous question, he was under the influence of drugs to the point where he had achieved a state of psychosis." He based his conclusion that appellant had sustained the "cerebral trauma" from appellant's statement that he had received an injury to his head while in high school in El Paso.

■ It should first be noticed that Dr. Ziporyn conducted no physical examination of appellant to determine if there was any evidence of his having sustained an injury to his brain. Secondly, "a state of psychosis" is not insanity under Texas law, McGee v. State, 155 Tex.Cr.R. 639, 238 S.W.2d 707.

III. Article 36, Vernon's Ann.P.C., provides in part that "Neither intoxication nor temporary insanity of mind produced by the voluntary recent use of ardent spirits, intoxicating liquor, or narcotics, or a combination thereof, shall constitute any excuse for the commission of crime."

Dr. Hernandez, called by appellant, testified that he examined appellant in jail after his conviction, and he also based his opinion as to the "cerebral trauma" from what appellant told him. He admitted that an x-ray of appellant's skull revealed no such injury. He stated that "none of those tests affirmatively indicated any brain damage." We quote further from his testimony when he said, "Well, we do know brain damaged individuals react * * * I think the memory can—can be lost because of brain injury, and because of the effects of the—of the medication and what have you."

Dr. Hornisher called by the state as set forth above testified that he had examined appellant after the trial and found that "* * * he was sane and responsible for his act."

Dr. Bennett, also called by the state, testified that he examined appellant after the trial and found him to be sane and expressed the opinion that he had never had any brain injury, and that he was sane at the time of the commission of the offense.

■ At the hearing neither appellant, his mother, nor his wife was called as a witness though they were shown to be present. If appellant had suffered brain injury while in high school their evidence would have been of great value. It should be noted that the existence of brain injury was a predicate for both Dr. Ziporyn's and Dr. Hernandez's opinions. After conviction, the burden is clearly upon the appellant to show insanity. This he failed to do.

■ IV. We overrule as we have in the past appellant's contention that death is cruel and unusual punishment for a crime. So long as it is prescribed by the legislature and has not been held unconstitutional by the Supreme Court of the United States, this Court will follow the legislative mandate, Sanchez v. State, Tex. Cr.App., 454 S.W.2d 210.

We hold that the court properly exercised his discretion in overruling the motion for new trial.

█ Appellant is not precluded from pursuing the remedies provided by Article 46.02, Sec. 5, V.A.C.C.P., "Insanity as bar to execution of death sentence."

The judgment is affirmed.

## OPINION ON APPELLANT'S MOTION FOR REHEARING

ONION, Judge.

On rehearing appellant contends this Court erred in holding that the trial court properly denied the motion for new trial based upon newly discovered evidence of insanity.

As pointed out in the original opinion, the appellant was examined prior to trial by a psychiatrist appointed by the court at the request of the retained defense counsel. A report of his findings was made available to the appellant and at the trial the defense of insanity was not raised. After a hearing on April 19, 1967, appellant's first amended motion for new trial was overruled with no mention of insanity being made at such hearing. Notice of appeal was then given as no sentence was to be imposed in view of the penalty assessed. See Article 42.04, V.A.C.C.P. While the appellate record was in the process of preparation, the court on June 27, 1967, permitted the substitution of counsel and ordered further mental examinations of the appellant. On September 7, 1967, appellant's new counsel filed a motion for new trial claiming newly discovered evidence of insanity. Notice of appeal was not withdrawn. This motion clearly came too late, and even if it did not, it still was overruled by operation of law when it was not acted upon within 20 days. Article 40.05, V.A.C.C.P.; Watkins v. State, Tex.Cr.App., 438 S.W.2d 819; St. Jules v. State, Tex.Cr.App., 438 S.W.2d

568; Steward v. State, Tex.Cr.App., 422 S.W.2d 733. Nevertheless, the trial court on December 20, 1967, heard evidence on said motion and formally overruled the same on January 3, 1968. The evidence heard was described in the original opinion. We remain convinced that there was no error in the court's action in overruling such "motion."

By supplemental brief appellant now contends for the first time on rehearing that at least five veniremen were improperly excused by the court under the test of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776.

The record reflects that at least 89 prospective jurors were examined although the record contains the examination of only 83.[1] Twenty-four (24) prospective jurors appear to have been excused because of their opposition to the death penalty, five of whom the appellant claims should not have been excused. The remaining 19 were properly excused under the Witherspoon standard. Upon the completion of the selection of the jury the appellant had exhausted his peremptory challenges but the State had exercised only five of their 15 peremptory challenges.

It is clear from the record that the prosecutor in this pre-Witherspoon case did not try to eliminate those jurors who merely had "conscientious scruples" against the death penalty but diligently pursued the matter to determine if this meant that the prospective juror would vote against the death penalty in any case regardless of the facts and circumstances. The appellant does not contend otherwise but urges the five prospective jurors did not state unambiguously that he or she would automatically vote against the death penalty regardless of the facts in any case.

Prospective juror Victor Ayala stated he had "conscientious scruples" against the death penalty and when asked if such "feeling" would render it impossible for

---

1. The transcription of the court reporter's notes reflects such reporter was not present during the voir dire examination of six of the prospective jurors.

him "regardless of the facts * * * to assess the death penalty as a form of punishment," he answered "Un-huh." The record then reflects:

"Q. Is that correct?

"A. Un-huh."

The prospective juror was then excused and he would appear to have been properly excused under Witherspoon.

Willie Jones not only answered that he had "conscientious scruples" but stated, "I don't buy the death penalty." The record then reflects the following before he was excused as a prospective juror:

"Q. In other words, you could not, in any type of case, regardless of the facts, impose the penalty of death.

"A. I don't believe so, not honestly, sir."

Mrs. James Jones, Mrs. Elma Lang and Mrs. Marguerite Morrissey all stated they had "conscientious scruples" against the death penalty. Upon further interrogation by the prosecution as to whether they could assess the death penalty in any case regardless of the facts, Mrs. Jones answered, "I don't think I could," Mrs. Lang replied, "I don't think so," and Mrs. Morrissey responded, "I don't believe I could."

While in the hindlight of Witherspoon, the voir dire examination could have been more complete and definitive and while it appears four of the prospective jurors may have been excused without a showing on their voir dire that they were disqualified under Witherspoon, it is noted that upon the discharge of the five prospective jurors in question, there was no request for further interrogation by the appellant and no objection to the court's action.

While recognizing that Pittman v. State, Tex.Cr.App., 434 S.W.2d 352, Scott v. State, Tex.Cr.App., 434 S.W.3d 678, and Huffman v. State, Tex.Cr.App., 450 S.W.2d 858, have been decided contrary to his contention, the appellant urges our re-consideration of such cases. This we did only recently at some length in Harris v. State, Tex.Cr.App., 457 S.W.2d 903 and while noting the split of authority in this country as to the proper application of the Witherspoon doctrine as well as the decisions of the United States Supreme Court in Boulden v. Holman, 394 U.S. 478, 89 S. Ct. 1138, 22 L.Ed.2d 433 and Maxwell v. Bishop, 398 U.S. 262, 90 S.Ct. 1578, 26 L. Ed.2d 221, we reaffirmed the position we had taken in Pittman and Scott, etc.

In the case at bar, the jury was selected in a manner consistent with the Texas practice discussed in Pittman and Scott which was held not to contravene the Witherspoon doctrine. See also Branch v. State, Tex.Cr.App., 447 S.W.2d 932; Whan v. State, Tex.Cr.App., 438 S.W.2d 918; Thames v. State, Tex.Cr.App., 453 S.W.2d 495. There was no effort, as in Witherspoon, to sweep from the jury panel all "conscientious objectors" in rapid succession without any effort to find out "whether their scruples would invariably compel them to vote against capital punishment." There was no systematic exclusion for improper cause. The record reflects that in every instance where a prospective juror indicated he or she had "conscientious scruples" against the death penalty the prosecutor pursued the matter beyond such initial expression to ascertain if that meant such prospective juror would vote against such penalty regardless of the facts "in any case," etc. It would certainly appear that a sincere effort was made to select only fair and impartial jurors. Of the 24 prospective jurors so excused, the appellant complains only of the discharge of five. To the discharge of these five the appellant addressed no objection, requested no further interrogation, nor indicated to the court his desire to have such jurors. No complaint of such discharges was made in the motions for new trial.[2] The claimed

2. It is here noted that in Turner v. State, Tex.Cr.App. (No. 42,194) the prosecution obtained affidavits from each of the prospective jurors whose discharge was complained about in the motion for new trial. Such affidavits reflecting that

error was raised for the first time on rehearing in this Court.

Appellant takes the position that under the true import of Witherspoon no objection at the trial to the exclusion of such "scrupled jurors" was necessary and urges that the court in passing upon a Witherspoon question may not properly take into consideration the number of peremptory challenges left to either party upon the completion and selection of the jury.

While the case at bar involved a pre-Witherspoon trial and appellant's trial counsel can be excused for failing to object upon the basis of that decision, the appellant nevertheless had the right under state practice to oppose the exclusions he now complains of which is a right similar to that articulated as a constitutional right in Witherspoon. See Pittman v. State, supra. We do not now consider that he is in a position to complain. See Harris v. State, supra. As noted in State v. Wigglesworth, 18 Ohio St.2d 171, 248 N.E.2d 607, the accused under such circumstances not only waives any right to object to the discharge complained of, but could be said to have induced the error first complained of on appeal. See also State v. Duling, 21 Ohio St.2d 13, 254 N.E.2d 670.

As earlier observed, the State utilized only five of its 15 statutory peremptory challenges. Even if the appellant had desired as jurors the five prospective jurors whose discharge of which he now complains, a claim he does not now even advance, there would have been no legal way for him to have obtained them as jurors if the State's desires were otherwise.

■ We are convinced that when the voir dire examination is considered as a whole,[3] the State did not "stack the deck" or cross the "line of neutrality" with respect to penalty in the selection of the jury or that the jury was a "tribunal organized to return a verdict of death."

Lastly, on rehearing it appears to be appellant's claim that the jury selection methods utilized resulted in a prosecution prone jury to pass upon the issue of guilt.

In Bradley v. State, Tex.Cr.App., 450 S.W.2d 847, in passing upon a similar contention, this Court said:

"If, however, it be appellant's contention that the jury selection methods utilized resulted in a prosecution prone jury to decide the question of guilt, then attention is called to Parks v. State, Tex. Cr.App., 437 S.W.2d 554, which, relying

such individuals were in fact not disqualified under Witherspoon despite any defect in their voir dire examination were introduced at the hearing on the motion for new trial. See Article 40.06, V.A.C.C.P. Such individuals could also be called as witnesses at such a hearing. In Jackson v. State, 285 Ala. 564, 234 So.2d 579, where four prospective jurors were apparently excused improperly under Witherspoon, the case was remanded by the Alabama Supreme Court for an examination of excused jurors to determine if in fact they could never return a death penalty regardless of the facts.

3. It would certainly seem that the "atmosphere of the proceedings" must be examined in resolving the question of whether the jurors were properly selected within the Witherspoon rationale. Jaggers v. Commonwealth, 439 S.W.2d 580 (Ky.); Illinois v. Speck, 41 Ill.2d 177, 242 N.E.2d 208.

In People v. Bernette, 45 Ill.2d 227, 258 N.E.2d 793, the Illinois Supreme Court held that where the prosecution had 33 of their 40 peremptory challenges remaining at the completion of jury selection and a sincere effort had been made to select fair and impartial jurors, exclusion from jury of individuals who stated they had conscientious scruples against capital punishment did not deny defendants a fair trial in murder prosecution. Twelve jurors or 21% of all jurors excused were improperly excused under Witherspoon standards but the court determined the error was not reversible, noting the sincere desire of the prosecutor and the court to determine the jurors' qualifications according to Witherspoon. The court cited People v. Speck, supra, and People v. Moore, 42 Ill.2d 73, 246 N.E.2d 299, in support of its holding. Justice Schaefer dissented. (The same court later reversed a conviction where the record revealed a conscious design on

upon Bumper[4] and Witherspoon, was decided contrary to appellant's contention. Appellant certainly has offered no more data than available in those cases to demonstrate that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt."

Appellant's motion for rehearing is overruled.

part of the State to empanel a jury which would not only impose the death penalty but would do so without hesitation. People v. Mallett, 45 Ill.2d 388, 259 N.E.2d 241 (Ill.). Here 27 jurors or 36% of all prospective jurors excused "were probably erroneously dismissed un-

der standards later enunciated in Witherspoon" with only 11 prospective jurors being properly discharged thereunder.)

4. Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797.