THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LARRY RUDOLPH, Defendant-Appellant.

First District (1st Division)   No. 62471

Opinion filed June 27, 1977.

560

McGLOON, J., dissenting.

James Geis, Lynn Sara Frackman, and Richard J. Geddes, all of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Myra J. Brown, and Joel M. Goldstein, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

After a jury trial, Larry Rudolph (defendant) was convicted of attempt armed robbery (Ill. Rev. Stat. 1973, ch. 38, par. 8—4) and acquitted of three counts of murder (Ill. Rev. Stat. 1973, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3)). Larry White was jointly charged and tried with defendant and was acquitted of all four offenses. Defendant was sentenced to 6 years and 4 months to 20 years. He has appealed.

In this court, defendant contends that his conviction of attempt armed robbery was legally inconsistent with his acquittal of murder; he was not proved guilty beyond a reasonable doubt; the trial court erred in permitting portions of codefendant White's repudiated confession inculpating defendant to be placed before the jury and the court improperly denied defendant's motion to exclude reference to his three prior convictions of misdemeanor theft. The State responds that defendant was proved guilty beyond a reasonable doubt; neither legal nor logical consistency of verdicts is required since differing verdicts reflect jury leniency and the use of the inculpatory portions of White's statement did not prejudice defendant because the statement was used solely for impeachment, defendant's attorney cross-examined White and a limiting instruction was given. The People further assert that

defendant's misdemeanor convictions were admissible as involving dishonesty and no abuse of discretion occurred in this regard.

Osie McCorkle testified for the State that she shared an apartment at 4544 S. Woodlawn in Chicago with Joseph Brown who used it for sale of wine and whiskey to the neighbors. At about 10 p.m. on September 17, 1973, two men wearing black masks broke into the apartment. The man who kicked her door open wore a goatee and was carrying a pistol. He forced her into her bedroom and onto the floor at the foot of the bed where her adult son, Sammy Collins, was sleeping. Collins had a gun on a chair near his bed. The man with the goatee demanded to know where the money was. She recognized his voice as belonging to defendant. The witness heard defendant say, "Don't do it," and then heard gunshots at the foot and head of the bed. As both intruders fled the apartment, defendant reached toward his back and said, "Ow." The police were called and the witness' son was taken to a hospital where he was dead on arrival. She described the bearded intruder to the police as being 5 feet 8-9 inches tall and having worn black clothing, including a black turtleneck sweater. In court, the witness identified a photograph of defendant, taken later that evening in the hospital, as depicting the goatee visible under the black mask worn by the intruder with the pistol. She was unable to identify the other man.

On cross-examination concerning the basis of her identification, the witness testified that she had seen and known defendant in the neighborhood for 3 or 4 years. During that time she had spoken to him many times. Prior to September 17, she saw defendant every evening when she got off the bus. She admitted testifying at the preliminary hearing that she did not "exchange any words" with defendant before September 17. However, at the same preliminary hearing she also testified that she had heard defendant talk but did not have a conversation with him.

Helen Pritchett testified that on September 17, she was defendant's friend and lived at 4518 S. Woodlawn where defendant kept his clothes. Between 10 and 10:30 that evening, defendant and another man came to the apartment. Defendant was dressed in black pants and a black shirt. At defendant's request she gave him a black turtleneck shirt. On cross-examination the witness testified that Larry White looked like the man who accompanied defendant but she could not be sure. She was certain, however, that White came to her apartment 15-20 minutes later and told her defendant had been shot. White helped defendant into the apartment and asked the witness to call for help. She left the apartment, leaving defendant in bed, and telephoned for an ambulance and the police. The police arrived and defendant was taken to the hospital. Later that evening, on two separate occasions, the police returned to her apartment.

Once they found a gun under the mattress on which defendant had been resting. Later they also found two black masks. The witness testified that defendant had some "teeshirts" made of the same type of material as these masks.

Chicago Police Officer Lis testified that he and his partner went to the Pritchett apartment at 10:30 p.m. in response to a radio call. He found defendant there, wounded. Defendant told him that he had been shot in an encounter with two men on Woodlawn, north of 47th Street. Larry White said he could identify the assailants and the officers placed him in a squad car and "toured the area." At that time, they received another call stating that a man had been shot at McCorkle's Woodlawn address which was separated from the Pritchett apartment by a vacant lot "three or four houses" wide.

Officer Rotkvich testified that he and his partner went to McCorkle's between 10:45 and 11:50 p.m. where Osie McCorkle provided a partial description of the intruders. Later, the officers returned to the station where White was being held. They advised White of his *Miranda* rights. He said he understood them and stated his willingness to talk about what happened that night. White said he had been near 47th and Woodlawn and had decided to make some money. He went to 4518 Woodlawn where he got a mask. White left that address and went to 4544 Woodlawn where he broke open the door, while wearing a mask. The woman who had answered the door was ordered into the bedroom. As he entered the bedroom, shooting started and he fled to 4518 Woodlawn where he removed his mask. The gun used in the shooting was left at the latter address.

Officer Rotkvich then spoke with Officer Minton who left the station and returned with a revolver which White identified as the gun involved in the shooting. The witness went to the Pritchett apartment where he recovered two masks, a black T-shirt and a pair of black pants. At the station, White said he had used one of the masks that night. The witness further testified that White had not been beaten in his presence and that White had not complained of physical abuse by any member of the police department.

A police firearms expert testified that a bullet removed from the body of the deceased had been fired from the gun found in the Pritchett apartment. In his experience it could not have come from any other gun. A fired bullet, found in the hallway, was not fired from that gun. There was medical evidence that the bullet which wounded defendant entered at his armpit and exited just to the left of the middle of his back.

Assistant State's Attorney Pisani testified that he arrived at the police station where White was being held at approximately 3 a.m. He advised White of his rights and White said he was willing to talk. White made an

oral statement similar to the statement allegedly made by White to Officer Rotkvich. On cross-examination, the witness testified that White had not said that he himself kicked in McCorkle's door, that he had a gun or that he had shot anyone.

A court reporter arrived and White's statement was repeated in question and answer form and transcribed. A 27-page transcript was identified by Pisani as the statement made by White. The witness further testified that White had not been beaten or struck while the statement was being made. Also White never told him that he had been beaten or coerced by the police.

This exhibit, which included statements inculpating defendant, was the subject of a pretrial motion for severance by defendant and a motion to suppress by White. The State agreed to excise all references to defendant from any testimony regarding the statement and the court denied the motion for severance. At the suppression hearing, White testified that the confession was the product of physical coercion by the police. The court held that the statement had been voluntary.

Larry White testified at trial that on September 17, 1973, he met some friends at 47th and Lake Park. They drank some bottles of wine together. White saw defendant when White went to buy more wine. He had not seen defendant previously since 1967 or 1969. The witness, defendant and another man separated from the group and walked down 47th Street. After stopping in two bars, White and defendant parted company at 46th and Woodlawn. White visited a woman friend for about 30 minutes, beginning at 9 or 9:30 p.m. White then left, walked north on Lake Park and turned west into an alley between 44th and 45th Streets. Hearing one or two gunshots from one-half to one block away, White went through a vacant lot onto Woodlawn where he saw defendant on the other side of the street. Defendant was holding his side, "sagging and staggering." White helped defendant upstairs to a second floor apartment. Helen Pritchett, whom White had never seen before, answered the door. After defendant had been helped into bed, they removed his black T-shirt and tended his wound. The police arrived and took White "riding around" in the vicinity. He was taken to an alley, beside McCorkle's apartment, where she was unable to identify him. White was then driven to the police station at about 12 or 1 a.m. where he was placed in an interrogation room.

The witness further testified that two officers beat and kicked him while he was handcuffed to a chair and told him the details of a false confession which he was to make later to an assistant State's Attorney. The story he was ordered to tell corresponded to previous testimony by State witnesses McCorkle and Pritchett. When the State's Attorney arrived, White told him the version of events forced upon him by the police. The

prosecutor had read from a card but the witness did not understand what was being read. When he indicated his noncomprehension, the State's Attorney just continued to read from the card.

A court reporter was brought in. While White's statement was being taken, the police officer sitting next to White kicked him on the ankle. After the statement was completed, the witness was threatened further and incarcerated overnight. The next afternoon a police employee read White's statement to him and he was told to initial each page and sign his name at the end. He complied. The witness testified that some of the questions and some of the answers from the night before were not included in the statement read to him. White denied ever going to McCorkle's apartment or in any way participating in the attempt robbery or murder.

On cross-examination by the prosecutor, portions of the transcribed statement were used extensively and in some detail for impeachment purposes. Included in the attempted impeachment, over objection by defendant's attorney, were parts of the statement which directly implicated defendant as the principal actor in the offenses. Defendant's counsel also cross-examined White, drawing attention to portions of the statement dealing with White's presence with defendant in the Pritchett apartment prior to the shooting.

Defendant testified on direct examination that he had been convicted of petty theft in 1966, 1967 and 1968. The trial court had previously denied defendant's motion *in limine* to prohibit use of the convictions during cross-examination by the State.

Defendant's testimony paralleled White's version of the events occurring between their meeting at 47th and Lake Park and their eventual separation in the area. Defendant then went to Helen Pritchett's apartment where he kept his clothes. Pritchett was the mother of his son. He left the apartment to look for his child. After calling for the boy without success, he was returning to the apartment when he saw two men in dark clothes. One of them called defendant a name and shot him below the right armpit. While defendant was trying to get back to the apartment, White came to his aid and helped him into the building and eventually into bed. Defendant stated that he was 5 feet 10 inches tall. He denied ever seeing or possessing the revolver from which the fatal bullet had been fired. He also denied seeing the two masks put in evidence by the State. Defendant further testified that he had never been in the building at 4544 Woodlawn, had never kicked McCorkle's door or engaged in a gunfight with her son on September 17, 1973.

In rebuttal, the People called the court reporter who testified that during the proceedings, he did not see White being kicked or beaten and White did not complain of any mistreatment. The witness also testified

that the transcript accurately reflected everything that was said by the assistant State's Attorney and by White.

The police employee who had read White's statement to him testified that she read each page slowly and stopped to get White's approval before turning each page. White made some minor corrections and seemed to understand everything that was read to him.

After closing arguments, the jury was instructed, in part, that evidence limited to one defendant should not be considered as to any other; evidence of prior inconsistent statements may be considered in deciding the weight of that witness' testimony, and a confession may not be considered against any defendant other than the confessor.

Defendant's first contention is that the verdict of guilty of attempt armed robbery is legally inconsistent with the three verdicts acquitting him of murder. The case most frequently cited in this regard is *People v. Hairston* (1970), 46 Ill. 2d 348, 362, 263 N.E.2d 840 which approved the principle that logical consistency in verdicts "is not necessary, so long as the verdicts are not legally inconsistent." This test has been modified in Illinois. In *People v. Dawson* (1975), 60 Ill. 2d 278, 326 N.E.2d 755, the supreme court held that there was no inconsistency where a defendant was acquitted of murder and felony murder but convicted of armed robbery. In this regard it is most instructive to read in *Dawson* the comments quoted on this problem from *United States v. Carbone* (2d Cir. 1967), 378 F.2d 420, 422-23, where the court of appeals pointed out that the salutary principle of leaving the jury "free to exercise its historic power of lenity" forbids allowing an acquittal on one charge to affect a simultaneous conviction. 60 Ill. 2d 278, 280-81.

■■ In this regard we note also the subsequent decision of this court in *People v. Murray* (1975), 34 Ill. App. 3d 521, 340 N.E.2d 186. In an exhaustive opinion, after an analysis of the decisions, including *Dawson*, this court held that acquittals do not affect a conviction "and that neither legal nor logical consistency of verdicts is now required in Illinois." (34 Ill. App. 3d 521, 537.) We note this same language subsequently cited as the conclusion of the court in *People v. Malone* (1976), 37 Ill. App. 3d 185, 190, 345 N.E.2d 801.

Even under the former rule we find no legal inconsistency in the verdicts here. A comparison of the essential statutory elements of attempt and of the three forms of murder with which defendant was charged shows that each of these four offenses are distinct with different component elements. In addition we find no logical inconsistency in these verdicts as they cannot "be construed to involve both the acceptance and the rejection of the same theory of the case for the State or the same theory of the defense." *People v. Murray* (1975), 34 Ill. App. 3d 521, 532.

The next issue is the contention that the evidence failed to prove

beyond a reasonable doubt that defendant was guilty of attempt armed robbery. Defendant here reaches back to the issue of consistency of verdicts. He argues that his acquittal on the murder charges necessarily implied a finding by the jury that he was not present at the scene of the crime. This reasoning is directly contrary to the conclusion reached in *Murray* and *Malone* that acquittals do not affect convictions. The major premise in defendant's argument is based upon consideration of the acquittals from which defendant attempts to attack the conviction. This is completely impermissible. In this portion of the argument the single and only legitimate issue is whether the evidence is sufficient to support the conviction for attempt armed robbery beyond reasonable doubt without comparison with the acquittals or the probable reasoning of the jury in that regard. In *Murray*, the court pointed out that logical inconsistency of verdicts might conceivably be a factor contributing to existence of a reasonable doubt. (34 Ill. App. 3d 521, 532.) However, absent legal inconsistency, no logical inconsistency requires reversal *per se*. We will, therefore, next consider the sufficiency of the evidence before us.

In our view, the record contains ample evidence to support defendant's conviction of attempt armed robbery beyond all reasonable doubt. Defendant was clearly identified by McCorkle as the man who broke open her door, forced her into the bedroom at gunpoint, demanded "Where is the money?" and then said, "He should have some money, you get down on the floor." The witness' prior acquaintance with defendant was sufficient to establish her ability to recognize defendant's voice with ease. Defendant attempts to capitalize on the discrepancy between the witness' testimony at trial that she had spoken to him many times and what defendant now represents as her preliminary hearing testimony that she had never exchanged words with defendant. Her actual preliminary hearing testimony was: "No, I didn't have a conversation with the young folks. I just speak to them and keep going." Defendant points to other minor discrepancies in the witness' testimony which are insufficient to shake her unwavering identification testimony.

■■ Defendant is further linked circumstantially to the crime through the masks and gun found at the Pritchett apartment and the ballistics testimony. The description of the intruder's clothing and height given by McCorkle was nearly identical to defendant's description that night. Defendant's testimony that he took no part in the offenses and was shot on the street by persons unknown was supported in part and contradicted in part by his codefendant White but was otherwise utterly unsubstantiated. Defendant urges inconsistency because the acquittals imply that the jury felt he was not present at the scene of the crime. This is pure speculation. Many other factors may have impelled the acquittals. It may be asserted with equal force that the acquittals resulted from an attempt by the jury

to be lenient to defendant. In any event the single issue presented to the jury here is one of credibility with the evidence above summarized on one side of the balance and defendant's testimony and, to some extent, the testimony of his codefendant on the other. The jury determined this issue and we cannot disagree with the result that they reached. The evidence is not so unsatisfactory as to permit a reasonable doubt of guilt. (*People v. Glover* (1971), 49 Ill. 2d 78, 84-85, 273 N.E.2d 367.) We conclude that the verdict of guilt of attempt armed robbery is strongly and convincingly supported by the evidence beyond reasonable doubt.

Defendant next argues that the prosecutor's extensive use of portions of White's statement inculpating defendant imparted substantive effect to the statement and therefore was prejudicial hearsay introduced under the guise of impeachment. Defendant concludes that the repetitive use of the statement accentuated by a remark by the prosecutor during closing argument denied him a fair trial.

As conceded by defendant, the availability of the declarant White for cross-examination by the defendant at trial satisfies the requirements of the confrontation clause. (*People v. Brooks* (1972), 51 Ill. 2d 156, 162-63, 281 N.E.2d 326, citing *Nelson v. O'Neil* (1971), 402 U.S. 622, 29 L. Ed. 2d 222, 91 S. Ct. 1723.) However, as a matter of state law, the Illinois Supreme Court has implicitly rejected the position that a declarant's availability for cross-examination renders prior inconsistent statements admissible as substantive evidence of guilt. (*People v. Collins* (1971), 49 Ill. 2d 179, 193-98, 274 N.E.2d 77. See also *People v. Gant* (1974), 58 Ill. 2d 178, 183, 317 N.E.2d 564, and cases there cited.) Therefore, under the law of Illinois we must consider whether the State's use of White's statement gave substantive effect to the portions inculpating defendant and, if so, whether defendant was thereby denied a fair trial.

Defendant has cited numerous authorities involving the improper use of prior inconsistent statements as substantive evidence under the guise of impeachment. Principal among them are: *People v. Bailey* (1975), 60 Ill. 2d 37, 49-59, 322 N.E.2d 804 (Underwood, C.J., joined by Ryan, J., dissenting) and cases there discussed and *People v. Fields* (1975), 31 Ill. App. 3d 458, 334 N.E.2d 752, *appeal denied* (1975), 61 Ill. 2d 599.

The record before us demonstrates that the prosecutor on a number of occasions used the White confession as substantive evidence against defendant. For example, on one occasion the prosecutor asked White whether he had testified on direct examination that he was not at McCorkle's apartment on the night in question. After White answered affirmatively, the prosecutor read portions of the statement which were incriminating against defendant and asked if White had been asked those questions and had made those answers. This verbatim reading from the transcript went far beyond the area which would be pertinent to impeach

White with reference to his answer to the initial question. In another instance, the prosecutor repeated testimony by White, given on direct examination, to the effect that he had never seen a gun in defendant's hand. The prosecutor then read a number of questions and answers from the confession in which White made the statement that he had seen a gun in defendant's hand at the time of the shooting in the McCorkle apartment. In our opinion, under the authorities above cited, this use of the statement by the prosecutor exceeded the bounds of legitimate impeachment and had the effect of using White's repudiated statement as substantive evidence against defendant.

However, this conclusion does not lead us to the result that the judgment is to be reversed. On the contrary, the evidence against defendant was convincing of his guilt beyond reasonable doubt, completely without reference to the White statement. The identification by Osie McCorkle was based upon long acquaintance with defendant. The black masks found by the police also tie defendant to the crime, particularly when considered in the context of the testimony of Helen Pritchett. Ballistics evidence showed that the fatal bullet had been fired from the gun found under the mattress used by defendant. With all of this evidence before it, the jury could hardly have reached any verdict other than guilt.

White's statement is the only evidence of his participation in the offenses charged. At trial he testified that he was not present in McCorkle's apartment. This was close in substance to Officer Lis' testimony regarding statements made by White. The written statement made by White was entirely to the contrary. He testified in great detail that the purported confession was false and resulted from police coercion. In deliberating upon the verdict in White's case, the jury therefore had the choice of believing two mutually exclusive variations of the matter. The fact that they acquitted White showed necessarily that they chose to believe that the confession was false. We conclude that, having thus decided that the confession was false as to White, the jury could not have placed credence in those portions of the White statement which inculpated defendant. As the Supreme Court observed in *Nelson v. O'Neil*, 402 U.S. 622, 629, 29 L.E.2d 222, 228, 91 S. Ct. 1723: "If the jury were to believe that the statment was false as to [the confessor] * * *, it could hardly conclude that it was not false as to * * * [his codefendant implicated in the statement] as well." In our opinion, therefore, the acquittal of White demonstrates that the jury was not influenced by his confession or by the references to defendant which occurred during cross-examination of White.

The point must be stressed that no Federal constitutional problem is

presented by this record. As above shown, there is no confrontation issue here. (*Brooks, Nelson.*) The error here is an alleged violation of the hearsay doctrine of Illinois in use of the White statement as substantive evidence against defendant. Under these circumstances, we have no hesitancy in reaching the conclusion of harmless error.

■■ We are therefore able to declare that the error above described was harmless beyond reasonable doubt. This was the result reached in *People v. Gant*, where the supreme court declared that similar error in using hearsay as substantive evidence rather than for impeachment was harmless error and affirmed the conviction. (58 Ill. 2d 178, 186-87.) We note also that in a similar situation involving use of hearsay as substantive evidence, Mr. Justice Ryan of the supreme court in dissenting took the position that since no constitutional issue is involved, the "harmless error beyond a reasonable doubt" test of *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824, is not pertinent and the only issue is "whether the competent evidence is sufficient to prove the defendant's guilt beyond a reasonable doubt." (*People v. Bailey* (1975), 60 Ill. 2d 37, 46-47.) In the case before us, as shown above, the evidence is sufficient to prove guilt beyond any reasonable doubt.

We have considered in this regard the final argument of the prosecution cited by defendant. The State's Attorney stated: "Whoever shot that gun, White told you it was Rudolph and Rudolph denies it." These few words can hardly be considered as a decisive or even important contribution to the verdict against defendant. *People v. Dukett* (1974), 56 Ill. 2d 432, 443-44, 308 N.E.2d 590.

A number of the cases which consider this difficult problem stress the absence of proper limiting instructions to the jury. (See, *e.g., People v. Fields* (1975), 31 Ill. App. 3d 458, 470-71, 334 N.E.2d 752.) On the contrary, in the case before us, as above shown, the instructions gave the jury proper directions to limit the use of the confession. We regard this as a further demonstration of the harmless nature of the alleged error. Compare *People v. Chitwood* (1976), 36 Ill. App. 3d 1017, 1026, 344 N.E.2d 611.

Our determination that the use of White's statement was not prejudicial to defendant is dispositive of defendant's argument that denial of his motions for severance was reversible error. Defendant, in his reply brief, concedes that his defense was not antagonistic to the defense offered by White. This factor is the primary consideration in determining whether a joint trial will deny either defendant a fair trial. (See, *e.g., People v. Bernette* (1970), 45 Ill. 2d 227, 240-41, 258 N.E.2d 793; *People v. Allen* (1976), 36 Ill. App. 3d 821, 825, 344 N.E.2d 825.) In the light of our conclusion that use of the statement did not deprive defendant of a fair

trial, we reject defendant's contention that the possibility of prejudice from the utilization of the statement apparent to the trial court at the time the severance motions were denied requires reversal here.

Defendant finally maintains that the trial court erred in refusing to prohibit the State's use of three misdemeanor theft convictions for impeachment purposes. We disagree. Since *People v. Montgomery* (1971), 47 Ill. 2d 510, 516, 268 N.E.2d 695, Illinois law has been that the credibility of a defendant who testifies may be impeached by evidence of a prior conviction if the crime "involved dishonesty or false statement regardless of the punishment unless * * * the judge determines that the probative value of the evidence of the crime is substantially outweighed by the danger of unfair prejudice." Further, the trial court is vested with discretion in weighing the probative value and harmful impact of such convictions. Pertinent factors include: the nature of the offense, remoteness of the conviction and the similarity of the prior offense to the crime charged. 47 Ill. 2d 510, 518; *People v. Nelson* (1975), 31 Ill. App. 3d 934, 938, 335 N.E.2d 79.

■■ Defendant argues that the scope of the *Montgomery* rule is necessarily limited to offenses in the nature of common law *crimen falsi*, crimes involving false representations which therefore bear directly on testimonial reliability. Perjury, counterfeiting and forgery are cited as examples of such offenses. We cannot accept defendant's premise that only crimes involving representational dishonesty are probative on the issue of testimonial credibility. We adhere to this court's decision in *People v. Ray* (1976), 36 Ill. App. 3d 283, 286, 343 N.E.2d 560, *appeal denied* (1976), 63 Ill. 2d 553, that the crime of theft "[is] an offense which reflects adversely on a person's honesty and integrity and thus relates directly to his credibility. (*Gordon v. United States* (D.C. Cir. 1967), 383 F.2d 936; *People v. Graham* (1975), 27 Ill. App. 3d 408, 327 N.E.2d 261.)" Another authority to the same effect which cites *Ray* is *People v. Clay* (1977), 45 Ill. App. 3d 145, 147, 359 N.E.2d 482. Our examination of the record convinces us that no abuse of discretion occurred in the admission of defendant's convictions for theft.

The judgment appealed from is accordingly affirmed.

BUA, J., concurs.

Mr. JUSTICE McGLOON, dissenting:

I respectfully dissent from the majority's decision, and would reverse the conviction and remand the cause for a new trial. I cannot agree with either the majority's finding of harmless error in the use of the codefendant's statement, or the holding that this defendant could be impeached with a prior conviction for misdemeanor theft.

## I.

White's repudiated confession inculpated defendant Rudolph. The law provides that the prosecution could properly impeach White with his prior confession, mentioning Rudolph, so long as White testified and was available for Rudolph's cross-examination. I wish to first state my disagreement with the prosecution's concept of the current state of the law because the possibility of harmful prejudice to the non-confessing defendant is overwhelming, notwithstanding his counsel's timely protestations and the trial court's cautionary instructions. The American Bar Association Standards Relating to Joinder and Severance, section 2.3(a), as approved 1968, provide what I believe to be a fair rule:

"Severance of defendants.

(a) When a defendant moves for a severance because an out-of-court statement of a codefendant makes reference to him but is not admissible against him, the court should determine whether the prosecution intends to offer the statement in evidence at the trial. If so, the court should require the prosecuting attorney to elect one of the following courses:

(i) a joint trial at which the statement is not admitted into evidence;

(ii) a joint trial at which the statement is admitted into evidence only after all references to the moving defendant have been deleted, provided that, as deleted, the confession will not prejudice the moving defendant; or

(iii) severance of the moving defendant."

The commentary to the tentative draft (1967) states: "The standard recommended here by the Advisory Committee rests upon the fundamental assumption that it is unrealistic to expect jurors to ignore completely the damaging evidence against the defendant in the codefendant's statement."

In the instant case, the prosecutor embarked upon a course precisely to the contrary of that recommended in section 2.3(a). When Rudolph's counsel moved for severance on the grounds of White's statement, the prosecutor initially promised that there would be no further inferences or references whatsoever to Rudolph, with the limitation that if White testified, the whole statement would be used. The motion was denied. Rudolph subsequently moved for a reconsideration of the ruling, asking the court to take cognizance of the ABA standard above quoted. The prosecutor then made the following statement:

"Your Honor, we would agree with the rules that are apparently being laid down by the American Bar Association that is recommended in the course to follow certain procedures as previously indicated to your Honor, electing to proceed with the

second alternative that [defense counsel] has mentioned, that being excision. We will endeavor, make every effort, and no reference will be made whatsoever to defendant Rudolph; as a matter of fact, Judge, we will not seek, I believe, at the conclusion of this trial to present that written document to the jury, assuming of course that the defendant White does not testify. If he does testify, of course, we don't have the problem, so there won't be any reference whatsoever in the statement, Judge, to defendant Rudolph."

Rudolph's counsel immediately responded in protest:

"Your Honor, if I may only take issue with [the prosecutor's] last statement that if Mr. White does not testify, we will still not have the problem. If Mr. White does testify, inasmuch as your Honor has ruled that that confession was a voluntary confession, that confession will certainly be able to be used by the state as impeaching against Mr. White; * * * if in fact Mr. White does take the stand and that statement can be used to impeach him, the harm that will be done to my client will be irreparable, and no instruction, no matter how well phrased by your Honor, could possibly cure the harm that would be done."

The motion for reconsideration was denied. As foreseen by defense counsel, prejudicial error certainly resulted. The prosecutor did not excise any mention of Rudolph from White's statement.

The prosecutor's comments reflect what I believe is an unreasonably short-sighted approach to the situation. It was agreed that, if White did not testify, the statement would have been sanitized, because of the resultant prejudice. If White testified, the prosecutor said that he could use the entire statement, apparently on the grounds that Rudolph could cross-examine White and thereby protect himself. This approach ignores the unfair prejudice injected into the case which not only may never be cured, but which is so scrupulously avoided if the nonconfessing defendant does not testify. To avoid this prejudice, I feel that if section 2.3(a) were followed, the prejudice in the instant case would have been avoided.

I further disagree with the majority's holding that the error in the prosecution's use of White's statement was harmless. The Doctrine of Harmless Error is often invoked by this court, and properly so, for it is in the interest of law and justice that convictions should not be reversed solely upon technical errors. There are, however, incidents of error which should never be categorized as harmless.

The prosecution committed error by exceeding the bounds of legitimate impeachment and by using White's repudiated statement as substantive evidence against defendant. The error was compounded

when the prosecutor argued to the jury from the substance of the statement which was to have been used only for impeachment purposes. The record discloses the following argument to the jury:

> "PROSECUTOR: You decide, you have to decide if Larry White is responsible for the conduct of Larry Rudolph and Larry Rudolph responsible for the conduct of Larry White. Whoever shot the gun, White told you it was Rudolph and Rudolph denies it. White gave a statement to the State's Attorney and said Rudolph shot it, but now he denies it. You decide whoever shot that gun, both are responsible. Both of them were trying to commit a crime of armed robbery."

It is, I believe, fairly clear that the prosecution not only used the statement improperly as substantive evidence of Rudolph's guilt, but also improperly argued to the jury from the substantive evidence admitted under the guise of impeachment. With all due respect to my colleagues, I cannot understand how the precedent of decisions in this jurisdiction could support a conclusion that the multiple errors in the use of White's statement were harmless to Larry Rudolph.

Our supreme court has taken a reasonably consistent stance as to the effect of such error. The fact that there was ample evidence of guilt was of little consequence in *People v. Montgomery* (1972), 51 Ill. 2d 198, 208, 282 N.E.2d 138, 143:

> "This court is reluctant to reverse a judgment supported by ample evidence but in our opinion the admission of the inflammatory testimony adduced in impeaching Allen deprived defendant of his constitutional right to a trial by a fair and impartial jury."

*Montgomery* was relied upon in *People v. Bailey* (1975), 60 Ill. 2d 37, 322 N.E.2d 804, where the State's similar improper tactics were held to have caused reversible error notwithstanding the prosecution's strong case.

The mystery of harmless error is elucidated somewhat by reference to the leading case, *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 710, 87 S. Ct. 824, which not only sets forth the harmless error beyond a reasonable doubt test, but also notes that "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error * * *." (386 U.S. 18, 23.) If the Illinois Supreme Court believes that misuse of a codefendant's repudiated statement has had the effect of depriving the defendant of his right to a fair trial in the face of ample evidence to convict, and the United States Supreme Court believes that the infraction of the right to a fair trial may never be harmless error, can the error in our case be as harmless as portrayed in the majority opinion?

There are instances where profound and overwhelming evidence of guilt may justify a finding of error which is harmless beyond a reasonable

doubt. In *People v. Gill* (1973), 54 Ill. 2d 357, 297 N:E.2d 135, for example, otherwise prejudicial error was deemed harmless beyond a reasonable doubt in the context of the absolutely overwhelming evidence of defendant's violent criminal rampage.

I believe that the overwhelming evidence of guilt rule of harmless error should be reserved only for the rare and occasional case, and not paraded regularly to affirm convictions. "A defendant, whether guilty or innocent, is entitled to a fair, orderly and impartial trial in accordance with our laws. Under our system of jurisprudence, there is not one form of trial for a guilty person, and a different form for an innocent person." (*People v. Cole* (1971), 132 Ill. App. 2d 1041, 1047, 271 N.E.2d 385, 390, *rev'd* (1973), 54 Ill. 2d 401, 298 N.E.2d 705.) In the instant case, defendant Rudolph was entitled to a fair trial, without the introduction of exceptionally improper prejudicial evidence, notwithstanding that the evidence against him may have been indicative of his guilt. Without diligent preservation of the right to a fair trial, our system of laws may degenerate to a tyrannical farce in which courts rule only in accordance with the doctrine of harmless error.

In the next instance, I also question whether the evidence against Rudolph was as overwhelming as portrayed by the majority. Although the majority believes that the prosecution had such a strong case against Rudolph, the jury apparently felt otherwise, finding him not guilty of two counts of murder and one count of felony murder. As to the conviction for attempt armed robbery, the majority concedes that the issue was one of credibility which was within the jury's function. This is not the usual hallmark of a case with overwhelming evidence of guilt.

## II.

The majority believes that the *Montgomery* rule permits impeachment by a prior misdemeanor theft conviction. I disagree.

The rule in *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695, is the Illinois Supreme Court's statement that Proposed Rule 609 adopted by the Committee on Rules of Practice and Procedure of the Judicial Conference of the United States should be followed in future cases. Rule 609 was subsequently enacted into law as Rule 609 of the Federal Rules of Evidence. (*Charlton v. Baker* (1976), 36 Ill. App. 3d 427, 344 N.E.2d 25.) The rules vary (*People v. Ray* (1973), 54 Ill. 2d 377, 297 N.E.2d 168), but under whichever version of Rule 609 is preferred, a witness may be impeached by proof of a prior conviction which "involved dishonesty or false statement regardless of the punishment." The majority herein holds as a matter of law that misdemeanor theft involves dishonesty. While at first blush it may seem that a petty thief may be dishonest, I believe that the correct interpretation of Rule 609 as

adopted in Illinois by *Montgomery* must lead to a different conclusion.

The Editorial Comment to Rule 609(a), reflecting the direct intent of the rule's drafters, states:

"The phrase 'dishonesty [or] false statement' denotes crimes such as perjury or subornation of perjury, false statement, criminal fraud, embezzlement, of false pretense, or any other offense in the nature of crimen falsi the commission of which involves some element of deceit, untruthfulness, or falsification bearing on the accused's propensity to testify truthfully." (28 U.S.C.S. app. at 66, Federal Rules of Evidence, Editorial Comment §609.1 (1975).)

It should be noted that Congress grappled with the meaning of "dishonesty or false statement" at great lengths, and the congressional debates contain explicit language that Congress intended "dishonesty" to be equated directly with *crimen falsi* and, further, that courts aided by the colloquy should know what Congress meant by "dishonesty" and would be able to apply the rule correctly.

If, as I believe, "dishonesty" is intended to be *crimen falsi*, the issue is whether misdemeanor theft is included within *crimen falsi.* Black's Law Dictionary defines the term as follows:

"The term involves the element of falsehood, and includes everything which has a tendency to injuriously affect the administration of justice by the introduction of falsehood and fraud. A crime less than felony that by its nature tends to cast doubt on the veracity of one who commits it. This phrase is also used as a general designation of a class of offenses, including all such as involve deceit or falsification; *e.g.*, forgery, counterfeiting, using false weights or measures, perjury, etc. Includes forgery, perjury, subornation of perjury, and offenses affecting the public administration of justice." (Citations omitted.)

In Illinois, *crimen falsi* has been expressly defined by our supreme court in *Matzenbaugh v. People ex rel. Galloway* (1901), 194 Ill. 108, 113:

"*Crimen falsi*, according to the better opinion, does not include all offenses which involve a charge of untruthfulness, but only such as injuriously affect the administration of public justice, such as perjury, subornation of perjury, suppression of testimony by bribery or conspiracy to procure the absence of a witness, or to accuse one wrongfully of a crime, or barratry, or the like."

A logical conclusion is that misdemeanor theft is not included within *crimen falsi.* The same conclusion has been reached by the Third Circuit United States Court of Appeals in *Virgin Islands v. Toto* (3d Cir. 1976), 529 F.2d 278. The opinion in *Toto* adeptly notes that a conviction for petit larceny may be in the nature of *crimen falsi* if the offense involves false pretense. I believe that this observation should be well taken in any

interpretation of Rule 609(a). For example, it is possible that a misdemeanor conviction under section 16—1(b) of our criminal code, theft by deception, may be considered to be included within "dishonesty or false statement."

The Illinois Supreme Court's most recent ruling on Rule 609's meaning, as interpreted initially in *Montgomery*, is the opinion in *Knowles v. Panopoulos* (1977), 66 Ill. 2d 585, where it is stated: "[T]he court must be more concerned with ascertaining the truth and should not allow into evidence a conviction which does not reasonably relate to testimonial deceit. Unfair prejudice results. Only if the crime bears a sentence of over one year or is a crime of dishonesty is it serious enough to assail the credibility of the witness." (66 Ill. 2d 585, 589.) The court further stated that a conviction for the misdemeanor offense of criminal trespass to a vehicle is not a crime of dishonesty or false statement. I believe that misdemeanor criminality does not *per se* include dishonesty or false statement, as evidence by both the legislative and judicial history of Rule 609(a).

The leading authority contrary to this position, cited by the majority opinion herein, is *Gordon v. United States* (D.C. Cir. 1967), 383 F.2d 936, which is readily distinguishable because it was decided without reference to and prior to the adoption of Rule 609. As explained above, Rule 609(a) employs the words of art "dishonesty or false statement" which are defined by official comment and congressional debates as being in the nature of *crimen falsi*. As a general proposition, a thief may be dishonest and *Gordon* was correctly decided under the prevailing law, but a different conclusion can be arrived at by a careful reading and understanding of Rule 609(a).

In the instant case, defense counsel's motion *in limine* to bar mention of defendant's prior misdemeanor theft convictions was denied, with the trial court deciding that theft involves dishonesty. I believe that the trial court erred, thereby causing defense counsel to bring out the prior convictions at the outset of defendant's direct testimony in an attempt to minimize the potential prejudice. I believe that improper prejudice resulted from the trial court's erroneous ruling.

### III.

Having discussed the various errors in this case, I believe that if each individual error is not considered prejudicial, certainly the totality of the errors should lead to a finding of prejudicial error. A defendant in a criminal case is entitled to a fair trial, as opposed to the type of trial afforded Larry Rudolph. I would reverse defendant's conviction for attempt armed robbery and remand this cause for a new trial.